DOROTHY M. CHESSON, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF ELMER R. CHESSON, DECEASED, v. PILOT LIFE INSURANCE COMPANY.

(Filed 21 September, 1966.)

**1. Insane Persons § 8—**

The executed contract of a mentally incompetent person is ordinarily voidable and not void.

**2. Same; Cancellation and Rescission of Instruments § 3—**

In an action to rescind a transaction, plaintiff's evidence that her intestate was mentally incompetent on the date he executed the agreement places the burden upon defendant to show that defendant was ignorant of the mental incapacity, had no notice thereof such as would put a reasonably prudent person upon inquiry, paid a fair and full consideration, that defendant took no unfair advantage of the incompetent, and that plaintiff could not restore the consideration or make adequate compensation therefor. Failure of defendant to establish any one of these factors entitles plaintiff to the relief.

**3. Same; Insurance § 19— Evidence held for jury in action to annul for mental incapacity insured's surrender of policy for cash value.**

Plaintiff's evidence was to the effect that for at least a year prior to insured's surrender of the policy in suit for its cash value, insured had been repeatedly committed to a hospital for acute alcoholism and resulting mental disorder, and that on the date in question he was incapable of understanding the nature and consequences of his act and incapable of transacting any business, and surrendered the policy for a cash value less than the dividend which would have been paid on the policy within a month. *Held:* Plaintiff's evidence was sufficient to defeat defendant's motion to nonsuit the action to annul the cancellation of the policy, and the jury's findings that defendant was not ignorant of such mental incapacity and had notice thereof sufficient to put a reasonably prudent person upon inquiry, and that defendant took unfair advantage of the insured, entitles plaintiff to the relief, the restoration of the consideration being accomplished by credit on the judgment.

**4. Evidence § 55—**

Where witnesses have testified as to the mental incapacity of the person in question, affidavits made by the witnesses in prior proceedings to have the person in question committed to a state hospital are competent for the purpose of corroborating their testimony.

**5. Insurance § 34—**

"Accidental means" within the coverage of an indemnity clause providing additional benefits if death results from injuries solely through external, violent and accidental means, requires that the occurence or happening which produces the death be accidental in the sense that it is unusual, unforeseen and unexpected, the word "accidental" being descriptive of the term "means."

**6. Same—**

Testimony to the effect that insured had been repeatedly committed for acute alcoholism and resulting mental disorder during the prior year, that

on the occasion in question he was standing in a corridor in a nervous condition, and that he suddenly threw his arms and hands across his chest and inexplicably jumped straight backward, striking his head on the cement floor, and died of cerebral hemorrhage, *is held* insufficient to show that his death resulted solely through violent, external and accidental means, since if insured voluntarily jumped backward the fall was not through accidental means, while if he jumped backward as a result of hypertension, delirium tremens, or some other mental or physical infirmity, the fall was not the sole cause of his death.

APPEAL by defendant from *Mintz, J.,* February 1966 Session of BEAUFORT.

Action by the beneficiary and administratrix of an insured to rescind his cancellation of a policy of life insurance for its cash surrender value and to recover the benefits provided therein.

On May 22, 1957, defendant Insurance Company issued to Elmer R. Chesson a policy of life insurance in the face amount of $5,000.00. Chesson was then 33 years old and the manager of the Colonial Stores in Belhaven. Plaintiff Dorothy M. Chesson, wife of the insured, was named as beneficiary. The policy contained the following accident indemnity insurance provision:

"Upon receipt of proof satisfactory to the Company, while this Policy is in full force and effect, that the Insured, while under the rated age of sixty-five and prior to the maturity of this Policy in any respect, has sustained bodily injury resulting in death within ninety days thereafter through external, violent and accidental means, death being the direct result thereof and independent of all other causes, then upon surrender of this Policy, and subject to its terms and stipulations, the Company will pay in addition to the face amount of this Policy, the sum of Five Thousand Dollars."

This accident-indemnity provision did not apply if death occurred "from disease or from bodily or mental infirmity in any form."

In 1963, Chesson was committed to Dorothea Dix Hospital, a State mental institution, for acute alcoholism with resulting mental disorders. He was a patient there in May 1963, and again in July 1963. On August 13, 1963, he quit his job at Colonial Stores and was recommitted to Dorothea Dix Hospital; in December 1963, he was a patient in the Veterans Hospital at Durham. In March 1964, he was again committed to Dorothea Dix Hospital, where he remained until the early part of May 1964, when he returned to his home in Belhaven. On May 14, 1964, Chesson removed the insurance policy from the chest of drawers where it was kept, took it to defendant's home office in Guilford County, and requested the full amount of its cash surrender value. Plaintiff was aware that Ches-.

son had, on two previous occasions, borrowed a total of $386.53 on the policy, but she was not aware that the insurance policy had been abstracted from the chest until after Chesson's death on June 8, 1964. Defendant informed her of the transaction by a letter dated June 23, 1964.

Plaintiff's evidence tends to show: From January 1, 1964, until June 8, 1964, Chesson's mental condition was such that he was incapable of understanding the nature and consequence of his acts and incapable of transacting any business. Plaintiff, who was employed as a hospital nurse, transacted the family business and paid the bills, including the premiums on the insurance policy.

After Chesson left home on May 14, 1964, he did not return until June 7, 1964. He had been drinking heavily. Fearing for her safety and that of their 16-year-old daughter, plaintiff swore out a warrant for his arrest and had him committed to jail. The following afternoon, June 8, 1964, Mr. Sam Boger, the Chief of Police of Belhaven, took Chesson out of jail and into the corridor of the City Hall to await the arrival of a relative who was to return him to the State hospital. Chesson was still suffering from the effects of alcohol. According to Chief Boger, while he was standing about 6 feet from Chesson, facing him in the open passageway, the following incident occurred:

"Mr. Chesson was standing smoking and he was very nervous, and all at once Mr. Chesson threw his arms and hands across his chest, this way, and more or less jumped straight backwards, striking his head on a cement floor. Yes, he did jump straight back. It was more like he jumped backwards, more so than just collapsing to the floor. He ended up on the floor. . . . There was blood on the cement under his head. Mr. Chesson was frothing at the mouth. . . . Of course, we carried him to the hospital."

Chesson died about one hour and forty-five minutes after he reached the hospital. According to Dr. J. T. Wright, who attended him:

"He had been suffering with hypertension, and had been dissipating the night before. He had been drinking about a year. When he could get it he was drinking excessively. . . . In fact that is what he was sent to Raleigh for. . . . He was not feeble-minded."

In the opinion of Dr. Wright, Chesson's death was caused by a cerebral hemorrhage.

Defendant's evidence tends to show: Chesson, clean and neatly dressed, came in a taxicab to the home office of defendant in Greens-

boro on May 14, 1964. He identified himself to Mr. Larry Rayle, the supervisor in the policy loan and cash surrender section of defendant's policyholders' service department, gave him the policy, and requested its surrender value. While records were being assembled and computations being made, Chesson requested that he be allowed to sign the necessary papers and said that he would come back for the check. He then left in the taxicab. In making the calculations, Rayle discovered that if the policy remained in effect another month, Chesson would be entitled to a dividend of $32.00, in addition to the policy's cash surrender value of only $25.40. When Rayle explained the situation to him, Chesson said he wanted the money immediately. Rayle then prepared a check for $25.40 (a refund of the April and May premiums) and delivered it to Chesson together with a letter setting forth the details of the transaction and the previous loans. Chesson took the check and left in the taxicab. He did not appear to have been drinking; he walked steadily and Rayle detected no odor of alcohol on his breath. Nothing in his appearance suggested that he was incompetent. In the opinion of Rayle, Chesson was mentally capable of transacting the business he conducted with him as well as any other business.

Psychiatrists of Dorothea Dix Hospital, testifying for defendant, said that Chesson was suffering from a mental disorder called a "depressive reaction." In the opinion of Dr. David H. Fuller, Jr., on May 14, 1964, Chesson had sufficient mental capacity to transact ordinary business on his own behalf, and when he left Dorothea Dix on May 9, 1964, he was not then in need of further psychiatric treatment.

Issues were submitted to the jury and answered as follows:

"1. Was Elmer R. Chesson on May 14, 1964, mentally competent to transact business?

ANSWER: No.

"2. (a) On May 14, 1964, was the defendant ignorant of Elmer R. Chesson's mental incapacity?

ANSWER: No.

(b) Did the defendant on May 14, 1964, have notice of such incapacity as would put a reasonably prudent person upon inquiry about his mental capacity to transact business?

ANSWER: Yes.

(c) Was Elmer R. Chesson paid a fair and full consideration for the surrender of his policy?

ANSWER: Yes.

(d) Did defendant on May 14, 1964, take unfair advantage of Elmer R. Chesson?

ANSWER: Yes.

(e)   Is plaintiff able to restore the consideration or to make adequate compensation therefor?

ANSWER: Yes.

"3.   Was the death of Elmer R. Chesson an accidental death within the meaning of the terms and provisions of the contract of insurance policy No. 441493?

ANSWER: Yes.

"4.   What amount, if any, are plaintiffs entitled to recover of the defendants?

ANSWER: $10,000.00."

Defendant excepted to the submission of issue No. 3.

From the judgment that plaintiff recover of defendant the sum of $10,000.00 less the sum of $413.00 (loan, interest, and premium refund), defendant appeals assigning as error, *inter alia,* the failure of the court to nonsuit the action.

*Carter & Ross for plaintiff appellee.*
*Peel & Peel; Rodman & Rodman for defendant appellant.*

SHARP, J.   The executed contract of a mentally incompetent person is ordinarily voidable and not void. *Reynolds v. Earley,* 241 N.C. 521, 85 S.E. 2d 904; *Walker v. McLaurin,* 227 N.C. 53, 40 S.E. 2d 455; *Carawan v. Clark,* 219 N.C. 214, 13 S.E. 2d 237. If, however, the person has been adjudged incompetent from want of understanding to manage his affairs and the court has appointed a guardian for him, he is conclusively presumed insane insofar as parties and privies to the guardianship proceedings are concerned; as to all others, it is presumptive (but rebuttable) proof of the ward's incapacity. *Medical College v. Maynard,* 236 N.C. 506, 73 S.E. 2d 315; *Sutton v. Sutton,* 222 N.C. 274, 22 S.E. 2d 553. See *State v. Duncan,* 244 N.C. 374, 93 S.E. 2d 421. Although the insured, Chesson, had been committed to Dorothea Dix Hospital under the provisions of Article 7, Chapter 122 of the General Statutes, as an alleged mentally disordered person, he had not been judicially declared insane as provided by G.S. 35-2, and no guardian had been appointed for him.

Plaintiff's evidence tended to show that on May 14, 1964, Chesson lacked the ability to understand the nature and effect of the act in which he was engaged when he surrendered the insurance policy for the amount of its unearned premiums, $25.40. Defendant offered cogent evidence to the contrary. The jury's answer to the first issue, however, established that on the day he surrendered the policy, Chesson was not mentally competent. The burden then devolved

upon defendant, if it would sustain its insured's cancellation of the policy, to show that it "(1) was ignorant of the mental incapacity; (2) had no notice thereof such as would put a reasonably prudent person upon inquiry; (3) paid a fair and full consideration; (4) took no unfair advantage of plaintiff; and (5) that the plaintiff has not restored and is not able to restore the consideration or to make adequate compensation therefor." *Carawan v. Clark, supra* at 216, 13 S.E. 2d at 238. *Accord, Wadford v. Gillette,* 193 N.C. 413, 137 S.E. 314. Its failure to establish each of these propositions, in the absence of unusual circumstances, would result in an annulment of the cancellation. *Lawson v. Bennett,* 240 N.C. 52, 81 S.E. 2d 162; *Dougherty v. Byrd,* 221 N.C. 17, 18 S.E. 2d 708. *Cf. In re Will of Shute,* 251 N.C. 697, 111 S.E. 2d 851; *In re Will of Kemp,* 234 N.C. 495, 67 S.E. 2d 672. The jury's answers to the second issue showed defendant unable to prove requirements (1), (2), (4), and (5). Obviously, the parties could be restored to their position on May 14, 1964, by plaintiff's returning to defendant the sum of $413.80. The judgment of the court accomplished this return.

Defendant, treating the complaint as having stated three distinct causes of action, made three separate motions of nonsuit: (1) to the cause of action for rescission of the surrender of the policy; (2) to the cause of action for the face amount of the policy; (3) to the cause of action for double indemnity for accidental death. Plaintiff's evidence tending to establish insured's mental incapacity was sufficient to defeat defendant's motions of nonsuit as to the first two "causes." *Carland v. Allison,* 221 N.C. 120, 19 S.E. 2d 245. The judge submitted the issues relating to this aspect of the case to the jury under a charge which was strictly in accord with the law as stated in *Carawan v. Clark, supra,* and *Wadford v. Gillette, supra.*

At the conclusion of plaintiff's evidence, the affidavits of Dorothy M. Chesson and Dr. James T. Wright, made on March 25, 1964, in the proceedings before the Clerk of the Superior Court to have Chesson recommitted to the State hospital were admitted by the court, over defendant's objection, for the purpose of corroborating these two witnesses, who had theretofore testified that Chesson lacked mental capacity to know and understand the consequences of his actions. The affidavits were clearly competent for this purpose. Stansbury, N. C. Evidence (2d Ed. 1963) §§ 50, 51. Each of defendant's assignments of error relating to the first and second issues is found to be without merit.

We come now to the assignment of error based upon defendant's exception to the refusal of the court to dismiss the cause of action based upon the accident indemnity clause of the policy. In order to recover the double indemnity proceeds of $5,000.00, plaintiff must

show that her husband "sustained bodily injuries resulting in death . . . through external, violent, and accidental means" and that his death was "the direct result thereof and independent of all other causes." If his death resulted wholly or in part from disease or bodily or mental infirmity, or if it did not result from bodily injury sustained through accidental means, she is not entitled to recover. As this Court has pointed out many times " 'accidental means' refers to the occurrence or happening which produces the result and not to the result. That is, 'accidental' is descriptive of the term 'means.' The motivating, operative and causal factor must be accidental in the sense that it is unusual, unforeseen and unexpected. . . . (T)he emphasis is upon the accidental character of the causation —not upon the accidental nature of the ultimate sequence of the chain of causation." *Fletcher v. Trust Co.,* 220 N.C. 148, 150, 16 S.E. 2d 687, 688. *Accord, Gray v. Insurance Co.,* 254 N.C. 286, 118 S.E. 2d 909; *Langley v. Insurance Co.,* 261 N.C. 459, 135 S.E. 2d 38.

The testimony upon which plaintiff relies to establish death by accidental means is that of Mr. Boger, the eyewitness, who said that as Chesson stood smoking nervously in the corridor, he suddenly threw his arms and hands across his chest and jumped straight backwards, striking his head on the cement floor. The immediate cause of his death was a cerebral hemorrhage.

The theory of plaintiff's case is that the fall caused the hemorrhage. There is no *competent* evidence that this is so. Conceding, however, for the purpose of weighing the motion for nonsuit, that the fall caused the hemorrhage rather than the converse, the record is devoid of any evidence that the fall was accidental. Chesson did not trip over an obstacle; he was not startled by an unexpected noise; he was not shoved or pushed. One moment he was standing still; the next, he jumped straight backwards and ended up on the floor. If he jumped backwards voluntarily, the fall was not through accidental means. *Langley v. Insurance Co., supra.* If he jumped backwards involuntarily as a result of a stroke brought on by hypertension, delirium tremens, or some other disease, mental or physical infirmity, the fall was not the sole cause of his death, and insured's death is not covered by the policy.

In our opinion, the admitted evidence does not show that Chesson's death from a cerebral hemorrhage was caused by accidental means. The reason for his backward jump is left to conjecture. Defendant's motion to dismiss plaintiff's cause of action for the accidental indemnity insurance should have been allowed.

The verdict on the third and fourth issues is set aside and the judgment entered is vacated. The cause is remanded to the Superior Court for the entry of judgment that plaintiff recover of the

defendant the sum of $4,586.20 with interest ($5,000.00, the face amount of the policy, less $413.80).

Error and remanded.