**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,**
Appellant,

v.

**Ethel Hill GERALD, Appellee.**

**No. 10542.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 6, 1966.

Decided Nov. 22, 1966.

Clyde T. Rollins and Armistead W. Sapp, Jr., Greensboro, N. C. (Armistead W. Sapp, Greensboro, N. C., on the brief), for appellant.

Welsh Jordan, Greensboro, N. C. (Charles E. Nichols, Edward L. Murrelle and Jordan, Wright, Henson & Nichols, Greensboro, N. C., on the brief), for appellee.

Before BOREMAN, J. SPENCER BELL and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Appellant seeks reversal of a judgment against it in the amount of $100,000.00, with interest, on a "Special Hazards Accident Policy," purchased by appellee's deceased husband's employer, wherein it insured him, under certain conditions,

against accidental injury or accidental death. Three basic questions, presented by a variety of motions throughout the litigation, are presented for decision. First, did the policy cover decedent, when he died while attending an awards dinner held in a country club constructed on property owned by his employer; second, was the decedent's death an accidental death within the meaning of the policy; and third, if coverage is found by reason of affirmative answers to the first two questions, was appellee entitled to interest from the date of filing proof of decedent's death? Also asserted as reversible error are two evidentiary rulings made during the course of trial. We conclude that each of these questions should be answered in the affirmative, that there was no error in the evidentiary rulings and that, hence, the judgment of the district court should be affirmed.

The decedent, W. A. Gerald, was a senior vice president of Pilot Life Insurance Company. His duties included attendance at dinner meetings throughout the twenty-two state area in which Pilot Life operated, to make promotional talks and present awards to Pilot's agents and employees in recognition of their efforts on behalf of Pilot, and to induce them to greater efforts to further the business of Pilot. Prior to September 24, 1964, Pilot purchased a policy of life insurance on the life of Mr. Gerald, in which his wife, the appellee herein, was the named beneficiary. The policy was in effect on September 24, 1964. By the terms of the policy, designated a "Specific Hazards Accident Policy," appellant agrees to pay $100,-000.00 in the event of the death of the named insured "resulting directly and independently of all other causes from injury * * *." "Injury" was defined to mean "bodily injury caused by accident occurring while this Policy is in force with respect to the Insured Person whose injury is the basis of claim and sustained under the circumstances and in the manner described in the attached Hazards Insert(s)." The "Hazards Insert(s)" set forth in the margin,[1] paraphrased in pertinent part, insured the decedent against accidental death "while on the business of the Policyholder [Pilot]" and during the course of any bona fide trip made by the decedent, if the trip required the decedent to travel outside the corporate limits of the town or city "in which he is regularly employed." By the terms of the insert, such a trip would be deemed to have commenced when the decedent left his "place of regular employment for the purpose of going on such trip."

The decedent was employed at Pilot's home office, located on 132 acres of land between Greensboro and High Point, North Carolina, outside of the corporate limits of any town or city. Two main buildings have been erected on this tract. One, on the northern side, is a multistory office building, which includes offices, a cafeteria, conference rooms, and other

---

1. "24-HOUR ACCIDENT PROTECTION WHILE ON A TRIP OUTSIDE CITY LIMITS—BUSINESS ONLY
Description of Hazards
The hazards against which insurance is provided under this Policy *are injury sustained by the Insured Person "while on the business of the Policyholder" and during the course of any bona fide trip made by the Insured Person, provided such trip requires the Insured Person to travel outside the corporate limits of the town or city in which he is regularly employed* or has his residence (excluding everyday travel to and from work and bona fide vacations).

*Such trip shall be deemed to have commenced when the Insured Person leaves his* residence, or *place of regular employment* for the purpose of going on such trip, whichever last occurs, and shall continue until such time as he returns to his residence or place of regular employment, whichever first occurs. (emphasis supplied)
Definitions
The term "while on the business of the policyholder" as used in this Policy means during any trip authorized by or at the direction of the Policyholder for the purpose of furthering the business of the Policyholder."

facilities for the conduct of Pilot's insurance business. There are employee parking lots to the rear and sides of this complex of buildings. About three-tenths of a mile south of this building is the Pilot Country Club, formed by Pilot "for the enjoyment and benefit of its home office staff, field office employees, agency representatives, and their families and friends." The country club was separated from the office buildings by a wooded area, a lake, a dam, and two small streams. It had a separate telephone, with a different number and separate listing, and separate parking facilities. Another relatively undeveloped 115 acre tract, owned by Pilot, was separated from this 132 acre tract by a railroad.

On September 24, 1964, the decedent, in the performance of his usual duties for Pilot, left his office suite on the fourth floor of the office building at about 4:30 P.M., the usual hour of closing, to attend an awards dinner to be held at the country club for the agents from the Salisbury, North Carolina district of the division of which decedent was the vice president. His attendance was for the usual purpose of making a promotional speech and presenting awards to agents with ten years' service. From his office the decedent went to the office building parking lot, entered his car and drove it to the country club parking lot, using a roadway contained solely within land owned by Pilot. He parked his automobile in the country club parking lot, then entered the country club, where he spent about an hour in the basement room chatting with fellow-employees and some of the agents from the Salisbury district, their wives and guests. During this time, he was observed drinking one highball and a glass of tomato juice.

When dinner was served at 6:00 P.M. the decedent, and all others present, were served a shrimp cocktail, lettuce salad, and then steak with vegetables. While the decedent was consuming the steak, he was observed to place his napkin to his face, his head dropped to the table and a bluish, purple color appeared in his neck and lower part of his face. Those present tried to assist him; his tie was loosened; he was carried to a couch; an unsuccessful effort was made to remove a piece of steak from his throat; and he was given artificial respiration. A physician and an ambulance were summoned. The physician, who arrived shortly after the decedent was first observed to be in difficulty, examined him and pronounced him dead. A later examination of decedent's body led to the discovery of a piece of steak, about the size of a silver dollar and about an inch thick, lodged in his hypopharynx, immediately above the larynx, so as to cut off all ingress of air. Death was caused by suffocation.

After appellee filed a proof of loss, appellant disclaimed coverage under the policy. In the suit which ensued, appellant moved for summary judgment; and when this motion was denied, the case was tried to a jury. At the conclusion of appellee's evidence, appellant moved for a directed verdict, which was denied, and, at the conclusion of all of the evidence, both parties sought a directed verdict. The later motions were held *sub curia* and the case submitted to the jury on special issues. After deliberations occupying part of two days, the jury reported its inability to agree and a mistrial was declared. Each party then filed a motion for a judgment *non obstante verdicto*, or, in the alternative, for a new trial. Making specific findings of fact, the district judge concluded that the decedent's place of regular employment was the main office building on the 132 acre tract, that his presence at the country club was part of a bona fide business trip which commenced at the main office building, and that decedent's death resulted directly and independently of all other causes from bodily injury caused by accident. The district judge entered judgment for appellee in the amount of $100,000.00, and allowed her interest at 6% from October 28, 1964, the date on which proof of loss was filed with the appellant.

■ We think the district judge was correct in his factual and legal conclusions, and we affirm the judgment below. We do so by application of the rule that, notwithstanding that the burden of proof is upon a plaintiff, a plaintiff is entitled to a directed verdict when the facts are so convincing that reasonable men could not differ as to their significance, particularly when there is no conflict in the evidence. Norfolk Southern Ry. Co. v. Davis Frozen Foods, 195 F.2d 662 (4 Cir. 1952); Davis Frozen Foods v. Norfolk Southern Ry. Co., 204 F.2d 839 (4 Cir. 1953), cert. den. 346 U.S. 824, 74 S.Ct. 41, 98 L.Ed. 349 (1953). See also, Wachovia Bank & Trust Co. v. United States, 288 F.2d 750 (4 Cir. 1961); Young v. Clinchfield Railroad Co., 288 F.2d 499 (4 Cir. 1961).

—I—

The question of whether the coverage of the policy extended to the decedent when he died while attending an awards dinner held in a country club constructed on property owned by his employer depends upon whether all of the conditions of coverage were met. From the face of the policy, it would apply only during the course of any bona fide business trip made by the decedent, provided the trip required the decedent to travel outside the corporate limits of the town or city in which he is regularly employed. There is no doubt that the decedent went to the country club for a business purpose—to present service awards to agents of Pilot who had achieved significant milestones in their period of service and to make a promotional and inspirational speech to all present. For an insurance company whose method of making money is to sell insurance, awards, promotional and inspirational addresses to agents who do the selling are a necessary business activity.

Whether the decedent was on a business trip away from his "place of regular employment" is a narrower question. The contract of insurance between Pilot and appellant was embodied in a printed form supplied by appellant. Appellant concedes that the form is in part inoperative because Pilot's entire 132 acre tract on which its home offices and the country club are constructed is outside the corporate limits of any town or city; hence, the provision of the policy that the "bona fide" trip must have required the decedent to travel outside the corporate limits of the town or city in which he was regularly employed is meaningless. The language following, however, that "such trip shall be deemed to have commenced when the Insured Person leaves his * * * place of regular employment * * *" is the language which presents the essence of the first question. Because the language requiring travel outside the corporate limits of the town or city in which decedent was regularly employed is meaningless, the later phrase terming the trip to have commenced when the decedent would leave his "place of regular employment" must be the only qualification to the requirement that the accidental death occur in the course of any bona fide business trip. Thus, we must decide whether decedent's death occurred away from his "place of regular employment."

On this narrow issue, appellant contends that Gerald's "place of regular employment" was the entire 132 acre tract; appellee argues that it was only the office building where the decedent maintained his suite of offices and adjacent parking lot. That the extent of the journey—three-tenths of a mile—from the office building to the country club is not significant is inherent in appellant's *concessum* in argument that the policy would apply had the decedent met an accidental death at an inn, sometimes used for awards dinners, across the road from the 132 acre tract and closer to the office building than the country club. Appellant's contention is, therefore, grounded solely on the fact that the country club was on the same tract as the office building and that it was, and could have been, used by the decedent for Pilot's business.

At the trial the evidence showed that the decedent was a member of the coun-

try club and was one of eight officers of Pilot designated as those who had the authority to reserve the club for social business. While the function of the club was primarily recreational, its by-laws provided that Pilot's official business took precedence over all other uses to which the country club could be put. Alcoholic beverages were not sold at the club, but there were in the clubhouse lockers for the storage of whiskey and other alcoholic beverages. There was a locker assigned to the division of Pilot of which the decedent was the senior vice president, and decedent had access to that locker. On the evening of his death, the guests attending the dinner consumed part of a bottle of bourbon whiskey which had been paid for by Pilot and which had been stored and removed from the division beverage locker.

■ While the case was submitted to the jury on the theory that "place of regular employment" was an ambiguous phrase, we do not perceive that this was so. "The common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it," 3 Williston, Contracts (1961 Ed.) § 618; 1 Restatement of the Law of Contracts (1932 Ed.) § 235(a). It is only where, after application of this rule and the correlative

rules set forth in the Restatement, supra,[2] the meaning to be given to a contract is still uncertain that resort may be had to secondary rules of interpretation to ascertain what the contract legally means. 1 Restatement, supra, § 236; 3 Williston, supra, § 619.

■ Short of the production of proof, the question of where was decedent's "place of regular employment" presented a factual question. Application of the primary rules of interpretation, however, raised no question of what the phrase "place of regular employment" meant generically, or in what sense the parties used it, because there is nothing in this record to show that "place of regular employment" meant or was intended to mean anything other than its common or normal meaning.[3] We conclude that decedent's "place of regular employment" presented only a factual question, and no problem of interpretation of what was sought to be expressed by the parties. We conclude, further, that under the evidence the only possible resolution of this question was that the decedent's "place of regular employment" was the building in which he had his office and the parking lots surrounding that building.

Appellant relies on decisions of the Supreme Court of North Carolina arising under the North Carolina Work-

2. "§ 235. RULES AIDING APPLICATION OF STANDARDS OF INTERPRETATION
The following rules aid the application of the standards stated in §§ 230, 233.
(a) The ordinary meaning of language throughout the country is given to words unless circumstances show that a different meaning is applicable.
(b) Technical terms and words of art are given their technical meaning, unless the context or a usage which is applicable indicates a different meaning.
(c) A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.
(d) All circumstances accompanying the transaction may be taken into consideration, subject in case of integrations to the qualifications stated in § 230.
(e) If the conduct of the parties subsequent to a manifestation of intention

indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach to it the manifestation."

3. Evidence was adduced to show Pilot's policy of paying a mileage allowance to its employees who were required to travel. The allowance began when an employee's automobile left one of the parking lots surrounding the office building. There was no evidence that appellant knew of or acquiesced in this practice. The only other evidence was proof that the policy was on a printed form prepared and furnished by appellant. This might be said to provide the factual basis for application of the familiar rule that in case of ambiguity a contract is to be interpreted most strongly against the party who wrote it. 3 Williston, supra, § 621.

men's Compensation Act, in support of the proposition that the decedent's "place of regular employment" included the entire 132 acres. Maurer v. Salem Co., 266 N.C. 381, 146 S.E.2d 432 (1966); Bass v. Mecklenburg County, 258 N.C. 226, 128 S.E.2d 570 (1962); Davis v. Devil Dog Manufacturing Co., 249 N.C. 543, 107 S.E.2d 102 (1959); and Bryan v. T. A. Loving Co., 222 N.C. 724, 24 S.E.2d 751 (1943), are cited. These cases all deal with whether there was injury at a time that an employee was on premises of his employer and whether, under such circumstances, his injuries could have been said to arise out of, and in the course of, his employment. These cases all seek to determine, in the light of a broad, remedial statute which is to be liberally construed to afford coverage, whether an employee was about his master's business at a time that he was injured. They do not establish immutable geographical limits of what are places of regular employment; place of injury is only one factor to be considered in determining whether the Act applies. At most, the cases support the correctness of the conclusion that decedent was on Pilot's business when he attended the awards dinner at the country club, but they are no authority for a negative answer to the question of whether the decedent had left his "place of regular employment" when he went to the country club.

—II—

The district judge correctly determined that decedent's death was an accidental death within the meaning of the policy. The district judge found:

"The evidence here establishes conclusively that a piece of steak lodged in the insured's throat, completely blocking his windpipe and caused his death. There is not the slightest evidence that the insured did it voluntarily or under circumstances from which he could anticipate death or bodily harm. This object caused the death of the insured as effectively as would death resulting from the heart being penetrated by a bullet. It was an unexpected and accidental death caused directly and solely by the object shutting off his windpipe."

■ The law of North Carolina, which governs us here, draws a distinction between a policy of insurance which insures against death by "accident," and one which insures against death by "accidental means." Metropolitan Life Insurance Co. v. Henkel, 234 F.2d 69 (4 Cir. 1956); Henderson v. Hartford Accident and Indemnity Co., 268 N.C. 129, 150 S.E.2d 17 (1966); Chesson v. Pilot Life Insurance Co., 268 N.C. 98, 150 S.E.2d 40 (1966); and cases cited therein.

■ In the *Henderson* case, supra, one of the latest expressions of the Supreme Court of North Carolina, it is said:

" * * * our courts have drawn a distinction between 'accident' and 'accidental means,' on the theory that although the results of an intentional act may be an accident, the act itself, that is, the cause, where intended, is not an 'accidental means,' that where an unusual or unexpected result occurs by reason of the doing by the insured of an intentional act, with no mischance, slip or mishap occurring in doing the act itself, the ensuing death or injury is not caused by 'accidental means.'" Id., 268 N.C. p. 132, 150 S.E.2d p. 19.

The policy in the case at bar insures against death or injury caused by "accident." We understand the law of North Carolina to be that because of this wording the policy covers if the decedent's death was an unusual or unexpected result of means knowingly and intentionally employed by him, although this would clearly not be the case if the policy excluded death "by accidental means." Death by suffocation resulting from the swallowing of food was certainly an "accident"; hence, the policy affords coverage.

The policies considered in the *Henderson* and *Chesson* cases, supra, as well as

the companion decision of Bentley v. Western and Southern Life Insurance Co., 268 N.C. 155, 150 S.E.2d 45 (1966), all of which are pressed on us by appellant, were all policies insuring against death or injury from accidental *means*, and the holdings therein not authority for concluding that the policy in the case did not afford coverage.

Notwithstanding that the policy contained no exclusion for excessive use of alcoholic beverages, appellant contends that the decedent's death occurred as a result of intoxication and, hence, did not result "directly and independently of all other causes from injury." In this regard the district judge found, and concluded:

"There is not the slightest evidence that alcohol as such was an effective, immediate and direct cause of his death. The blocking of his windpipe, being the sole cause of death, would have killed him whether sober or drunk. If, as defendant contends, the alcohol might have played some part in his swallowing the meat, it amounts to nothing more than what happened in Pilot Life Insurance Co. v. Ayers, supra [163 F.2d 860 (4 Cir. 1947)], and Metropolitan Life Insurance Co. v. Henkel, supra [234 F.2d 69 (4 Cir. 1956)]. The mere remote or indirect cause falls short of an immediate proximate cause. Hence, on this phase of the case plaintiff is entitled to a directed verdict."

Our consideration of the record leads us to rest content on what was said by the district judge. The sobriety of the decedent was vouched for by all who saw him on the night in question. He was observed to consume at most only one highball, followed by tomato juice, which was seasoned by Worcestershire sauce. True, a blood sample taken after death indicated a high alcohol content, but this test was admittedly erroneous because some of the chemicals used to conduct it had become contaminated, and the margin of error was unknown.

We conclude, therefore, that decedent's death was an accidental death within the meaning of the policy.

—III—

A week after decedent's death, Pilot reported that fact, in a letter dated October 1, 1964, to appellant and requested it to supply the proper forms on which proof of claim could be made. The letter was not acknowledged until twenty days later, and the forms not furnished until they were transmitted in a letter dated October 26, 1964. The following day, appellant dispatched another letter requesting full disclosure of the events preceding and leading up to the decedent's death and, in particular, why he was present at the country club, what function he was performing, and in what capacity he was serving when he died. The forms and responses to all of these inquiries were mailed to appellant October 28. Appellant rejected the claim on November 23. Neither in its letter of rejection nor at any time thereafter did it seek any additional information about the circumstances of the decedent's death.

In the light of these facts, the interest allowance was correctly made. General Metals, Inc. v. Truitt Mfg. Co., 259 N.C. 709, 131 S.E.2d 360 (1963); Harris and Harris Const. Co. v. Crain and Denbo, Inc., 256 N.C. 110, 123 S.E.2d 590 (1962); Miller v. Barnwell Bros., 137 F.2d 257 (4 Cir. 1943).

—IV—

We find appellant's two complaints of rulings on the evidence lacking in merit.

Appellee showed, through the testimony of the president of Pilot and a second vice-president of Pilot, who was decedent's assistant, the duties which the decedent performed for Pilot, and the place where they were performed. Appellant objected to this testimony, on the ground that the "best evidence" rule required such matters to be proved by Pilot's corporate minutes, its charter and by-laws, and the minutes of Pilot's executive committee. The district judge

ruled that while documentary proof of the decedent's authority was pertinent, it was not the only method of proving the decedent's "regular place of employment," and overruled the objections. What appellee proved was not a document, the production of the original of which was required (McCormick, Evidence (1954 Ed.) § 195), but how and where decedent performed his duties. We are constrained to add that it would be unusual if, in fact, the charter, by-laws and minutes of Pilot would prove the decedent's duties and the manner and place of performing them in the degree of detail necessary for a determination of his place of regular employment.

Appellee sought to impeach the testimony of the second vice-president in regard to some of the decedent's duties on the basis of certain statements contained in a settlement agreement by and between appellee, the decedent's minor daughter, and Pilot and Globe Indemnity Company, Pilot's workmen's compensation insurance carrier. The settlement agreement was entered into in final disposition of a claim made under the North Carolina Workmen's Compensation Act, and recited that, notwithstanding the decedent's attendance at a dinner for the purpose of presenting awards to employees, Pilot contended that the decedent was not required to perform this function, because someone else could have performed it and, in any event, while he was eating dinner he was performing a personal function unrelated to his job. The settlement agreement was executed on behalf of Pilot by an attorney and not by the witness who was sought to be impeached.

The settlement agreement was not a proper basis for impeachment. The portion sought to be used by appellant was a statement of legal conclusions and not of facts and, moreover, was not a statement made by the witness sought to be impeached. We are aware, also, that usually workmen's compensation litigation is in the control of the workmen's compensation carrier. Manifestly, the district judge was correct in sustaining an objection to cross examination based on the agreement.

Affirmed.