NEW YORK STATE TEACHERS RETIREMENT SYSTEM, Plaintiff,

v.

Peter KALKUS, et al., Defendants.

Civ. A. No. 84–0139–A.

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 2, 1984.

Rodney F. Page, Joseph M. Fries, Russell M. Blau, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for plaintiff.

Grayson P. Hanes, Hazel, Beckhorn & Hanes, Mark W. Wasserman, Fairfax, Va., Paul C. Madden, Rawle & Henderson, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

### I. *Findings of Fact*

#### A. *Introduction*

1. In this action, many of the facts are undisputed. The parties established them by entering into a stipulation of facts ("Stipulation") and by agreeing to admit into evidence a large number of documents ("Exhibits").

#### 2. *The Parties*

a. Plaintiff New York State Teachers Retirement System ("Teachers") is a public pension system created and existing pursuant to Article 11 of the Education Law of the State of New York and having the powers and privileges of a corporation pursuant to Section 502 thereof. Teachers' principal place of business is in Albany, New York. It administers a system of retirement and pension benefits for retired public school employees in New York.

b. Defendant Peter Kalkus ("Kalkus") is an individual resident and citizen of the State of New Jersey. He is engaged in the business of real estate investment individually and through various entities, including all of the other defendants in this action. Kalkus is the chairman and sole stockholder of defendant Lamar Properties, Inc.; general partner of defendant Arlington Alliance, Ltd.; general partner of defendant Polk & Taylor Associates; and sole stockholder of Lamar Financial, Inc.

c. Defendant Lamar Properties, Inc. is a Delaware corporation, having its principal place of business in New Jersey.

d. Defendant Arlington Alliance, Ltd. ("Arlington Alliance") is a limited partnership established under the laws of the Commonwealth of Virginia. Its general partners are defendants Kalkus and Lamar Properties, Inc.

e. Defendant Polk & Taylor Associates ("PTA") is a limited partnership established under the laws of Virginia. Its sole general partner is defendant Kalkus. Several dozen limited partners are residents of numerous states, including New York.

f. Defendant Lamar Financial, Inc., is a Delaware corporation, having its principal place of business in New Jersey.

g. Defendant Lamar Financial Partnership ("Lamar") is a limited partnership established under the laws of Virginia. Its sole general partner is defendant Lamar Financial, Inc.

#### 3. *The Properties*

a. This action involves a controversy over the interpretation of particular terms in mortgage agreements pertaining to the James Knox Polk Building and the Zachary Taylor Building ("the properties"), located on adjacent parcels of land in Arlington County, Virginia. *See* Stipulation No. 1.

b. The properties are commercial office buildings in the Crystal City area of Arlington County. Most of the office space of both buildings is subject to long-term, be-

low-market rental leases held by the United States government. These leases will expire in 1990. *See* Testimony of Lowell Blom.

B. *The Modification Agreements*

1. Royal National Bank of New York ("Royal") provided the original construction financing for the properties, obtaining first mortgages on both of the properties. In 1970, Royal assigned the two mortgages and the notes they secure to plaintiff Teachers. *See* Stipulation No. 2.

2. In 1972, as a result of events not relevant to this action, Cabot, Cabot and Forbes Land Trust ("Cabot") acquired title to the properties. At present, Cabot is known as Bay Colony Property Company, Inc. *See* Stipulation No. 14.

3. On October 31, 1972, Teachers and Cabot entered into two Modification Agreements, modifying the terms of the outstanding notes and mortgages on the properties held by Teachers. *See* Stipulation No. 3. The agreements are nearly identical. One relates to the James Knox Polk Building, the other to the Zachary Taylor Building. *See* Exhibits D–30 and D–33.

4. Both Modification Agreements provide that the maker of the agreement shall pay the holder of the notes fifteen percent (15%) of the "Gross Receipts" from the properties in excess of $3,500,000 per year. *Id.*

5. In addition, both agreements include an "Excess Refinancing Proceeds" provision, which reads as follows in the Modification Agreement relating to the James Knox Polk Building:

As additional interest to be paid to the Holder of this Note, Maker shall pay to the Holder of this Note, immediately upon receipt, fifteen percent (15%) of any Excess Refinancing Proceeds from the Property (as defined herein). Excess Refinancing Proceeds from the Property shall mean the excess of (i) the principal amount of the first new mortgage placed upon the Property prior to the expiration of one year from the date (hereinafter referred to as the 'Final Payment Date')

of the discharge and release of the Deeds of Trust, over (ii) the sum of (a) the unpaid principal balance of the Deeds of Trust immediately prior to the Final Payment Date plus (b) any prepayments of principal without penalty on the Deeds of Trust paid after the date hereof beyond the regular monthly installments of principal and interest plus (c) Four Hundred Thousand Dollars ($400,000.00). For purposes hereof, the term "mortgage" includes deeds of trust, security deeds, or other similar security instruments. *See* Exhibit D–30.

6. The Modification Agreement relating to the Zachary Taylor Building contains the same Excess Refinancing Proceeds provision as that set forth above, except that the $400,000.00 amount is changed to $600,000.00. *See* Exhibit D–33.

7. Both Modification Agreements provide that the mortgage balance on the James Knox Polk Building is to be paid in full by June 20, 1985; and the balance on the Zachary Taylor Building is to be paid in full by October 20, 1985. *See* Exhibits D–30 and D–33.

8. If no prepayments are made between now and 1985, except for scheduled amortization payments, the mortgage balance due to Teachers on June 20, 1985 is $5,581,378.58. The mortgage balance due on October 20, 1985 is $7,403,246.84. *See* Testimony of James Campbell.

9. The Modification Agreements were properly executed by Teachers and Cabot, and were properly recorded as required by the applicable laws of Virginia. *See* Stipulation No. 12.

C. *The 1973 and 1974 Transactions*

1. On May 15, 1973, Cabot conveyed the Properties to Jefferson Plaza Management Corporation ("Jefferson"). Jefferson delivered to Cabot its note in the amount of $6,306,248.16, secured by a deed of trust on the properties ("Jefferson Mortgage"). Teachers consented to this conveyance and to the terms of this sale. *See* Stipulation No. 4 and Exhibits D–36 through D–42.

2. On February 5, 1974, Jefferson conveyed the properties to defendant Arlington Alliance. In connection with this sale, Arlington gave Cabot its note dated February 5, 1974, in the amount of $17,087,765.43. This note was secured by a wraparound deed of trust on the properties dated February 5, 1974 ("Arlington Wrap Mortgage"). In addition, Arlington Alliance agreed to assume Jefferson's liability on the $6,306,248.16 note and to increase the amount of this note to $8,142,865.48. The increased amount of this note was secured through an agreement of amendment of deed of trust, which was placed on the properties ("Arlington Morgage"). Teachers consented to the conveyance to Arlington Alliance and to the terms of this sale. *See* Stipulation No. 5 and Exhibits D–43 through D–54.

3. Throughout the period that it owned the properties, Arlington Alliance complied with the Gross Receipts provisions of the Modification Agreements. *See* Testimony of Peter Kalkus.

## D. *The 1983 Transactions*

1. Because the Cabot and Teachers loans became due in 1984 and 1985 respectively, in the fall of 1982 defendant Kalkus began seeking additional financing for the properties. He desired to maintain ownership of the properties at least through 1990 when the federal government's below-market rental leases expired. *See* Testimony of Peter Kalkus.

2. In the fall of 1982, Kalkus planned a series of transactions with two lenders, Aeneas Venture Corporation ("Aeneas", an affiliate of the Harvard University endowment fund) and InterFirst Bank of Dallas, N.A. ("InterFirst"). These transactions were designed to replace all of the existing mortgages on the properties as follows:

(1) An advance of $7,000,000.00 from Aeneas, an interim loan of $12,000,000.00 from InterFirst and proceeds of a syndication of limited partnership interests in defendant PTA were to be used to discharge the Jefferson and Arlington Wrap Mortgages, and to provide operating funds for the defendants.

(2) In 1984, a second advance of $12,000,000.00 from Aeneas would be used to repay the InterFirst interim loan.

(3) In 1985, a third advance of $12,000,000.00 from Aeneas would be used to repay Teachers' mortgages on the properties. All the Aeneas loans were to be made in exchange for a note and deed of trust in the amount of $69,000,000.00. *See* Testimony of Peter Kalkus and Exhibit D–78.

3. In November 1982, defendant Kalkus approached Teachers, requesting Teachers' consent to the terms of the above described financing transactions. Kalkus submitted his request in writing on November 17, 1982. *See* Exhibit D–58. Following the receipt of this letter, Teachers requested additional information about the proposed financing, which Kalkus supplied. *See* Testimony of James Campbell and Peter Kalkus, and Exhibits D–62 through D–64.

4. On January 4, 1984, Kalkus met with Lowell Blom (head of the mortgage department of Teachers) and James Campbell (a Teachers' mortgage department employee) to discuss the defendants' secondary financing of the properties. At the meeting, the participants discussed the applicability of the Excess Refinancing Proceeds provisions (contained in the earlier Modification Agreements) to the proposed transactions. Kalkus offered to pay some monetary consideration to Teachers in exchange for a waiver of the provisions. Teachers neither accepted Kalkus' offer nor consented to the proposed transactions. *See* Testimony of Lowell Blom, James Campbell and Peter Kalkus.

5. A few days after the January 4, 1984 meeting, in a telephone conversation between James Campbell and Kalkus, Teachers denied the defendants' request for consent regarding the proposed financing of the properties. Defendants did not receive a written denial of their request. *See* Testimony of James Campbell.

6. On January 14, 1983, Kalkus released a supplement to the Private Place-

ment Memorandum earlier used to solicit prospective limited partners in PTA. In the supplement, Kalkus advised potential investors that Teachers had refused to consent to the proposed transactions, and that the transactions would be consummated regardless of whether Teachers granted its consent. The supplement advised potential purchasers of a substantial risk that Teachers could accelerate its first mortgage on the properties, and that the Excess Refinancing Proceeds provisions may apply to the proposed transactions. *See* Exhibit P-2.

7. On January 24, 1983, the following transactions took place:

a. Arlington Alliance conveyed the properties to Lamar.

b. Aeneas entered into a loan agreement with Lamar, agreeing to loan $31,000,000.00 in four installments:

(1) $7,000,000.00 at closing

(2) $12,000,000.00 on June 1, 1984

(3) $5,130,000.00 on June 1, 1985

(4) $6,870,000.00 on October 1, 1985.

Aeneas advanced the first installment, secured by a deed of trust on the properties in the principal amount of $69,000,000.00. The principal amount of the Aeneas loan is $31,000,000.00. The loan also contains $38,000,000.00 of original issue discount interest. *See* Testimony of Peter Kalkus and Exhibits D-78 through D-81.

c. InterFirst entered into a loan agreement with Lamar, agreeing to advance $12,000,000.00, secured by a deed of trust on the properties.

d. Lamar conveyed the properties to PTA. In exchange, PTA executed and delivered to Lamar a note of $55,000,000.00, secured by a deed of trust on the properties. *See* Stipulation Nos. 6 through 9, Exhibits D-70 through D-75 and D-79 through D-86.

8. On or about January 25, 1983, the Jefferson, Arlington and Arlington Wrap Mortgages were paid in full and cancelled. The Certificates of Satisfaction were properly recorded. *See* Stipulation Nos. 10 and 12, and Exhibits D-76 and D-77.

9. In June 1984, Aeneas advanced to Lamar the second installment of its loan in the amount of $12,000,000.00, which was used to satisfy the indebtedness to InterFirst.

10. At present, PTA owns the properties. *See* Stipulation No. 11.

11. Since it acquired title to the properties in January 1983, PTA has paid (and Teachers has accepted) mortgage payments under the 1972 Modification Agreements, excluding sums owed under the Excess Refinancing Provisions at issue in this case. *See* Testimony of Lowell Blom.

## II. *Conclusions of Law*

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

■ (a) Plaintiff Teachers is a citizen of New York for jurisdictional purposes. It is not an "alter ego" of the State of New York, but a separate entity. *See* N.Y. Educ.Law §§ 501, *et seq.* (McKinney 1969 & Supp.1983). Public school employees, not the state treasury, will benefit from any recovery obtained by plaintiff. *Blease v. Safety Transit Co.,* 50 F.2d 852 (4th Cir.1931); *Morrison-Knudsen Co., Inc. v. Massachusetts Bay Transportation Authority,* 573 F.Supp. 698 (D.Idaho 1983); *Bowen v. Hackett,* 387 F.Supp. 1212 (D.R.I. 1975). Moreover, Teachers is not performing an essential government function. *Idaho Potato Com'n v. Washington Potato Com'n,* 410 F.Supp. 171 (D.Idaho 1976); *Morrison-Knudsen,* at 701, 703–4. *But see 21 Properties, Inc. v. Romney,* 360 F.Supp. 1322 (N.D.Tex.1973).

■ (b) All the defendants, for jurisdictional purposes, are citizens of New Jersey or Delaware. Although there is a split between courts on the issue, this Court holds that the citizenship of a limited partnership is determined by the citizenship of all of its general partners, without regard to the citizenship of any limited partners. *See Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966);

*Wroblewski v. Brucher,* 550 F.Supp. 742 (W.D.Okla.1982); *Sixth Geostratic Energy Drilling Program v. Ancor Exploration Co.,* 544 F.Supp. 297 (N.D.Okla.1982); *Williams v. Sheraton Inns, Inc.,* 514 F.Supp. 22 (E.D.Tenn.1980); *C.P. Robinson Construction Co. v. National Corp. for Housing Partnerships,* 375 F.Supp. 446 (M.D.N.C.1974). *Contra Elston Investment, Ltd. v. David Altman Leasing Corp.,* 731 F.2d 436 (7th Cir.1984); *Carlsberg Resources Corp. v. Cambria Savings & Loan Ass'n.,* 554 F.2d 1254 (3d Cir.1977); *Conroy v. Winn,* 581 F.Supp. 1280 (D.D.C.1984); *Hereth v. Jones,* 544 F.Supp. 111 (E.D.Va. 1982); *Grynberg v. B.B.L. Associates,* 436 F.Supp. 564 (D.Colo.1977). Accordingly, the citizenship of the limited partnership PTA cannot be New York. The presence of New York limited partners has no effect on its citizenship for diversity purposes.

▪ (c) Teachers failure to join Cabot as a party in this action does not interfere with this Court's subject matter jurisdiction. Cabot is not an indispensable party. Determining indispensability of parties is an issue of federal law, within this Court's discretion. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). By failing to join Cabot, Teachers has not prejudiced Cabot's interest nor will any judgment rendered in Cabot's absence be inadequate. *See* Federal Rule of Civil Procedure 19(b). Cabot no longer owns the properties. Its present rights and obligations under the 1972 Modification Agreements are not at issue in this case.

2. There is an actual controversy between the parties, which is ripe for adjudication. *See, e.g. John Hancock Mutual Life Ins. Co. v. Webcor, Inc.,* 311 F.2d 701 (7th Cir.1962).

▪ 3. As present or past owners of the properties, defendants PTA, Lamar and Arlington Alliance are each subject to the obligations of the "Maker" as defined in the 1972 Modification Agreements. These defendants did not personally assume any of the obligations set forth in the agreements; however, they took subject to those obligations to the extent of their respective interests in the properties. G. Glenn, *Mortgages,* §§ 252, 262 (2d Ed.1970); G. Osborne, *Mortgages,* § 252 (2d ed. 1970); R. Tiffany, *Law of Real Property,* § 1435 (1939 & Supp.1984); *Owen v. Lee,* 185 Va. 160, 37 S.E.2d 848 (1946); *C.B. Van Nostrand & Co. v. Virginia Zinc & Chemical Corporation,* 126 Va. 131, 101 S.E. 65 (1919).

The defendants have recognized their obligations under the Modification Agreements by complying, as the "Maker", with the Gross Receipts provisions of the contracts. Moreover, defendant Kalkus noted in the supplement to the Private Placement Memorandum regarding PTA that the properties could be subject to foreclosure if defendant Lamar did not comply with the terms of Teachers' first mortgages. *See* Exhibit P–2.

4. Because they took subject to the obligations of the "Maker" under the 1972 Modification Agreements, defendants PTA, Lamar and Arlington Alliance must comply with the Excess Refinancing Proceeds provisions found in both agreements or risk foreclosure of the first mortgage by Teachers.

5. Under the Excess Refinancing Provision, the "first new mortgage" referred to is the earliest-in-time financing agreement designed to replace plaintiff Teachers' first mortgage on the properties.

▪ (a) This Court's function in construing the 1972 Modification Agreements is to give effect to the intention of the parties as determined by the language in the contracts. *Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1931). Moreover, it is this Court's duty to look at the whole instrument when determining that intent. *Short v. A.H. Still Investment Corp.,* 206 Va. 959, 147 S.E.2d 99 (1966), *Brand Distribu-*

*tors, Inc. v. Insurance Co. of North America,* 532 F.2d 352, 353 (4th Cir.1976).

■ (b) Both Modification Agreements require the maker to pay additional interest upon the receipt of the "first new mortgage". The phrase "first new mortgage" is not synonymous with the phrase "any subsequent mortgage", as the defendants in essence argue. Rather, the choice of the word "new" denotes the parties' intent to describe a mortgage designed to begin anew the financing process, discharging the previous debt to Teachers.

■ (c) In addition, the use of the word "Refinancing" in the provisions at issue supports this Court's reading of the phrase "first new mortgage". According to Black's Law Dictionary, "refinance" means "To finance again or anew ... The discharge of an obligation with funds acquired through the creation of a new debt." *See* Black's Law Dictionary, p. 1152 (5th ed. 1979). This Court must turn to the common and ordinary usage of language when construing an agreement. *American Casualty Co. v. Gerald,* 369 F.2d 829 (4th Cir.1966); *Bolin v. Laderberg,* 207 Va. 795, 153 S.E.2d 251 (1967). Accordingly, the "first new mortgage" referred to in the Excess Refinancing Proceeds provisions is that earliest-in-time mortgage obtained to discharge the preexisting debt to Teachers.

■ (d) This Court also finds that the parties intended the Excess Refinancing Proceeds provisions to be a means by which Teachers would share in the appreciation of the properties. *See* Testimony of Lowell Blom. The parties had a reasonable expectation that the properties would increase in value as the expiration of the below-market government leases grew closer in time. Tying the amount of additional interest owed to Teachers to the amount of new financing obtained by the maker of the agreements was a reasonably reliable measure of the expected appreciation. The additional interest owed to Teachers would only accrue upon the maker's refinancing of the property.

(e) Similarly, the formula stated in the Excess Refinancing Proceeds provisions (used to calculate the additional interest owed) supports this Court's interpretation of the phrase "first new mortgage". The additional interest is based primarily on the difference between the principal amount of the new mortgage and the principal amount of Teachers' loans. Such a comparison is meaningless unless the new mortgage is intended to replace the Teachers mortgage.

■ 6. To be a "first new mortgage" (as that phrase is defined in the Excess Refinancing Proceeds provisions), new financing must be placed upon the properties prior to the expiration of one year from the date of the discharge and release of the Teachers Deeds of Trust. *See* Exhibits D–30 and D–33. This Court holds that a new mortgage, recorded prior to the actual discharge of Teachers' loans, satisfies the provision, for a refinancing mortgage must be recorded at least a short time before funds can be disbursed to pay off and discharge a prior debt.

■ 7. The Aeneas loan agreement of January 24, 1983 constitutes the "first new mortgage" placed upon the properties. As defendant Kalkus testified, the purpose of entering into the Aeneas loan agreement was to obtain long term financing for the properties. Defendants intend to discharge Teachers' first mortgages with the third installment of the Aeneas loan. *See* Testimony of Kalkus.

8. In contrast, the earlier Jefferson, Arlington Wrap and Arlington Mortgages were not designed to advance funds to discharge the Teachers mortgage. Rather, these earlier loans were subordinate mortgages, not falling within the scope of the Excess Refinancing Proceeds provisions of the 1972 Modification Agreements.

9. The principal amount of the Aeneas mortgage is $31,000,000.00, for that is the amount defendant Lamar is to receive under the Aeneas loan agreement. *See* Exhibit D–74. The remainder of the $69,000,000.00 amount of the loan is the original

issue discount or, in other words, the interest on the mortgage note. *See Microdot, Inc. v. United States,* 728 F.2d 593 (2d Cir.1984).

10. The amount of "Excess Refinancing Proceeds" under the Modification Agreements equals $31,000,000.00 (the principal amount of the first new mortgage) less $13,984,625.42 (the sum of the unpaid principal balances at maturity plus $1,000,000.00), which equals $17,015,374.58. Fifteen percent of the Excess Refinancing Proceeds is $2,552,306.19, which is the amount of additional interest Teachers is entitled to receive based on the loan agreement between Aeneas and the defendants.

11. The additional interest calculated above does not account for the possibility of partial prepayments of the mortgage balance. If the defendants choose to make prepayments, the additional interest owed by defendants to Teachers must be calculated in accordance with section (ii)(b) of the Excess Refinancing Proceeds provisions.

■ 12. The additional interest computed above is also not due and payable until the Teachers' loans are actually discharged. This assures that the "first new mortgage" is in fact obtained and used to satisfy the indebtedness to Teachers, as intended by the language of the Excess Refinancing Proceeds provisions. The additional interest will be due on June 20, 1985 for the James Knox Polk Building and on October 20, 1985 for the Zachary Taylor Building, or at such earlier date upon which the defendants choose to discharge Teachers' first mortgages. *See* Finding of Fact B-7.

13. Until the sums become due and payable, no interest attaches to the additional sums owed by the defendants to Teachers under the Excess Refinancing Proceeds provisions of the 1972 Modification Agreements.

14. Defendants have failed to establish any affirmative defenses against Teachers' entitlement to the additional interest computed above.

■ (a) Teachers did not waive its right to additional interest by accepting payments of principal and interest after the transactions on January 24, 1983. Defendants' failure to comply with the Excess Refinancing Proceeds provisions was a continuing default, not cured by making other payments of principal and interest. Moreover, the first mortgage provides that acceptance of monthly payments by the holder of the notes shall not constitute a waiver of the right to declare a default and accelerate payment. *See* Exhibit D-2. The cases cited by the defendants in opposition to this Conclusion of Law are not on point. Neither involves the acceptance of payments distinct from those at issue in the particular cases.

■ (b) Defendants waived the benefit of the provisions of the Modification Agreements requiring Teachers to respond in writing within 30 days to any request for consent to a transaction involving the properties. At the January 4, 1983 meeting, defendant Kalkus demonstrated his continued desire to obtain Teachers' express consent to the proposed transactions. And, the supplement to the Private Placement Memorandum reflects the defendants' acquiescence to Teachers' oral denial of consent.

■ (c) Defendants' arguments of laches and estoppel also are not affirmative defenses to Teachers' entitlement to the additional interest. Again, on January 4, 1983, defendant Kalkus was aware of Teachers' opposition to his proposed transactions. And, in the Private Placement supplement not only did he acknowledge Teachers' position, but also indicated his willingness to proceed with the transactions, risking the possibility of foreclosure on the properties.

■ 15. Finally, defendant Kalkus is not personally liable for the judgment herein declared. As noted in Conclusion of Law no. 3, the defendants did not personally assume any of the obligations set forth in the 1972 Modification Agreements. Rather, they took subject to those obligations to

the extent of their respective interests in the properties.

16. A declaratory judgment is appropriate in this case to define the respective rights of the parties in and to the properties. 28 U.S.C. §§ 2201, 2202 (1982). Therefore, the Court declares a judgment consistent with the Findings of Fact and Conclusions of Law set forth above.

## FINAL ORDER

This declaratory judgment proceeding comes before the Court for resolution following a full bench trial on September 12, 1984. Based upon the stipulations of fact entered into by the parties, the exhibits, evidence and argument of counsel at trial, and for the reasons set forth in the accompanying memorandum opinion, this Court declares the rights of the parties to be as follows:

1. Plaintiff New York State Teachers Retirement System ("Teachers") is entitled to receive additional interest under the Excess Refinancing Proceeds provisions of the 1972 Modification Agreements at issue in this case, based upon the loan agreement between the defendants and Aeneas Venture Corporation.

2. Plaintiff Teachers is entitled to receive additional interest in the amount of $2,552,306.19, if no prepayments other than the scheduled amortization payments are made by the defendants to Teachers between the date of this order and the dates upon which the mortgage balances are due in full.

3. If the defendants choose to make prepayments, the additional interest owed by the defendants to Teachers must be calculated in accordance with section (ii)(b) of the Excess Refinancing Proceeds provisions of the 1972 Modification Agreements.

4. Plaintiff Teachers is not entitled to receive the additional interest hereby declared to be owed until such time that the defendants discharge Teachers' first mortgage on the properties focused upon in this case.

5. Therefore, until such time of discharge, no interest attaches to the additional sums owed by the defendants to Teachers.

6. The defendants' rights and interests in the properties will become subject to, subordinate to and conditioned upon the payment of the additional interest when that interest becomes due and payable. At that time, plaintiff Teachers may foreclose upon the properties if the additional interest is not paid.

7. Defendant Peter Kalkus is not personally liable for the additional interest declared to be owed to Teachers.